UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

In re
CLARK S. MEYER and                                          Case No. 11-24099
SARA M. MEYER,
                          Debtors.                          Chapter 7

_____

MEMORANDUM DECISION ON UNITED STATES TRUSTEE'S MOTION TO DISMISS

_____

This matter came before the Court upon the United State Trustee's motion to dismiss

pursuant to 11 U.S.C. § 707(b)(1), based on 11 U.S.C. §§ 707(b)(2) and (3).  The debtors

opposed the motion on the ground Official Form 22A, Chapter 7 Statement of Current Monthly

Income and Means Test Calculation, violates their constitutional right to religion and religious

belief.  Both parties submitted briefs in support of their respective positions.  This is a core

proceeding under 28 U.S.C. § 157(b)(2)(A) and the Court has jurisdiction under 28 U.S.C. §

1334.  The following constitutes the Court's findings of fact and conclusions of law pursuant to

Fed. R. Bankr. P. 7052.  For the reasons stated below, the motion to dismiss is granted but stayed

for 30 days to allow the debtors to convert this case to one under chapter 13.

BACKGROUND

On March 28, 2011, Clark and Sara Meyer filed a voluntary petition for relief under

chapter 7 of the Bankruptcy Code.  On the same date, the debtors filed Schedules A through J, a

Statement of Financial Affairs, and a Statement of Current Monthly Income and Means Test

Calculation.  According to the debtors' Schedules and Means Test Form and the affidavits

presented to the Court, the following facts are undisputed.  The debtors have no unsecured

priority debts and $152,260.00 in general unsecured creditors, almost all of which appear to be

credit card debts.  The debtors have secured debts totaling $184,708.00, which includes a first

mortgage secured by real property.  The debtors claimed a household size of six persons with a combined current monthly income of $9,277.00, which annualized is above the median income level for the debtors' household size.  The debtors claimed $8,865.98 in total deductions allowed under 11 U.S.C. § 707(b)(2).  Because the presumption of abuse arose on the means test form, the debtors claimed further expenses totaling $2,324.00 for vehicle insurance, additional school tuition, and college expenses.  The debtors are both employed; the debtor husband is as an architect and the debtor wife is a parochial school teacher.

The debtors took the following monthly deductions that the United States Trustee argued were not reasonable and necessary and/or are excessive: $187 for retirement deductions, $900 for school tuition (*not* including additional school expenses of $150, instrument rental of $60, and childcare of $100), $400 for medical expenses, $20 in bank fees, and $395 for a vehicle payment that has subsequently been paid in full.  After Sara Meyer first became a teacher in the ACES Xavier Catholic education system in 2007, the debtors enrolled their children in the parochial schools.  As a benefit of Sara's employment, the debtors receive a 50% discount on tuition.

While the parties agreed an evidentiary hearing may be necessary to determine the reasonableness of certain of the debtors' other expenses, the parties filed briefs regarding the appropriateness of the parochial school tuition expense.

## ARGUMENTS

The debtors argue 11 U.S.C. § 707(b) compels them to choose between exercising their constitutional rights  – to the free practice of religion, the right to educate their children and the right of the children to receive such education – and receiving the economic benefit of a discharge under 11 U.S.C. § 727.   The choice to practice one's religion by having one's children attend a religious school is a form of worship, and as a result of this choice it is irrelevant

2

whether or not it is a requirement to attend private Catholic school as part of the Catholic religious faith. The educational limits in section 707(b)(2)(A)(ii)(IV) are nothing more than a covert suppression of a debtor's right to practice religion and the United States, through this act of Congress, is dictating how they should practice it. According to the debtors, the United States does not have a compelling interest in enforcing section 707(b)(2)(A)(ii)(IV), and it does not have a compelling in interest in specifically controlling the debtors' decision to exercise their constitutional rights.

The US Trustee argues the Court should reject the debtors' Free Exercise claim because section 707(b) of the Bankruptcy Code is neutral on its face and does nothing to preclude the debtors from practicing their religion. Additionally, even if the Code did have an effect on the debtors' religious practice, any such effort is incidental and well within constitutional bounds. The government has a compelling interest in ensuring the fair and efficient application of the Bankruptcy Code for both debtors and creditors, and the debtors' attempt to use the Code to subsidize private school expenses runs counter to that compelling interest.

DISCUSSION

Section 707(b)(2)(A)(i) of the Bankruptcy Code requires the Court to presume that a chapter 7 filing is abusive when the debtors' current monthly income, reduced by certain amounts set forth under section 707(b)(2)(A)(ii), (iii) and (iv), and multiplied by 60, is not less than (I) the lesser of 25 percent of the nonpriority unsecured claims in the case or $7,025, whichever is greater; or (II) $11,725. The presumption of abuse, if it arises under section 707(b)(2)(A), may only be rebutted by demonstrating "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no

3

reasonable alternative." 11 U.S.C. § 707(b)(2)(B). The debtors have not met their burden of rebutting the presumption of abuse.

The debtors are not attempting to demonstrate special circumstances. Instead, they challenge the provisions contained in section 707(b)(2)(A)(ii)(IV), which limit the deduction on the means test for educational expenses. That section provides:

> In addition, the debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,775 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses referred to in subclause (I).

11 U.S.C. § 707(b)(2)(A)(ii)(IV). This section allows a debtor to deduct $147.92 per month per child in educational expenses. Because the debtors' monthly religious educational expenses exceed this amount, they contend the provision is unconstitutional.

This is not the first instance in which the availability of a discharge under the Bankruptcy Code has faced constitutional scrutiny. In 1973 the Supreme Court held that an indigent individual was not denied due process or equal protection by being required to pay a fee for commencing a bankruptcy case as a condition to obtaining a discharge. *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631 (1973). Specifically, the Court found that there was not a constitutional right to obtain the discharge of debts in bankruptcy. *Id*. at 445-47. In the most general sense, "[b]ankruptcy laws regulating economic activity do not involve constitutionally protected conduct and, thus, are subject to 'a quite lenient test for constitutional sufficiency.'" *See also In re Stewart*, 175 F.3d 796, 811 (10th Cir. 1999) (quoting *In re Kelly*, 841 F.2d 908, 915 (9th Cir. 1988)) (considering constitutionality of § 707(b) under vagueness and equal protection standards).

4

If the question were the Meyers' access to bankruptcy relief, it would be easily answered. They obviously have such access, but they want a chapter 7 discharge, not the burden of funding a chapter 13 plan for five years. *See* 11 U.S.C. § 1325(b)(4)(A)(ii) (applicable commitment period for above median income debtors). *Kras* makes clear that the right to a bankruptcy discharge is not a fundamental constitutional right, so congressional regulation only requires a "rational justification." 409 U.S. at 446. If the activity at issue is not constitutionally protected, then a statute will run afoul of the First Amendment only if the law's application to protected rights is substantial in relation to the scope of the law's plainly legitimate applications. 1 Bankr. Desk Guide *Relationship to Other Constitutional Provisions* § 1:11 (2011) (citing *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631 (1973) ("Bankruptcy is hardly akin to free speech or marriage or to those other rights, so many of which are imbedded in the First Amendment, that the Court has come to regard as fundamental and that demand the lofty requirement of a compelling governmental interest before they may be significantly regulated.")). Thus, in most instances where bankruptcy legislation is challenged on constitutional grounds, the applicable standard for determining whether the statute denies equal protection of the law is that of rational justification.

As the Supreme Court in *Kras* pointed out, there have been periods in American history when there has been no bankruptcy relief available at all, and now that there is, it is entirely within the province of Congress to provide for it – with rational justification, of course – however it deems fit. 409 U.S. at 447. This includes the amendments to section 707(b) made by the 2005 Bankruptcy Abuse Prevention and Consumer Protection Act, which provided a mathematical formula for determining abuse of the bankruptcy process, rather than the application of judicial discretion previously used to determine substantial abuse. Congress

5

clearly has a rational justification in setting objective standards for qualifying for a chapter 7 discharge.

In the Meyers' case, however, the debtors are arguing that the application of what would otherwise be a neutral and rationally based statute impinges on their First Amendment right to free exercise of their religion, which is clearly a fundamental right. The debtors challenge the constitutionality of the means test formula, 11 U.S.C. § 707(b)(2)(A)(ii), as it applies to the debtors' right to send their children to Catholic parochial school, which they consider a form of religious practice. The First Amendment provides, inter alia, that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. Though freedom to act in the implementation of one's beliefs may sometimes be restricted, this clause has been interpreted by the Supreme Court to mean that the government is prohibited from interfering with or attempting to regulate any citizen's religious beliefs. 16A Am. Jur. 2d *Constitutional Law* § 443 (2011) (citing *School Dist. of Abington Tp. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560 (1963)). Thus, a stricter standard than the "rational basis" test may be required.

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595 (1990), the Supreme Court acknowledged that as a general rule, free exercise of religion challenges to neutral, generally applicable laws warrant only rational basis review. Rational basis is an extremely deferential standard of judicial review. Under a rational basis analysis, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *See, e.g., Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620 (1996). However, *Smith* identified an exception in cases where a challenged regulation implicates "hybrid-rights" by burdening religious freedom in combination with another

6

constitutionally protected right, "such as ... the right of parents ... to direct the education of their children." *Smith*, 494 U.S. at 881-82 (citation omitted).  Under these narrow classes of circumstances, *Smith* indicates that, in order to withstand judicial scrutiny, a challenged regulation must be justified as advancing a compelling governmental interest and must be narrowly drawn to achieve that interest.  The "hybrid-rights" test has been vastly criticized[1] in both its form and application by the lower courts, and it appears that it would not apply when a nonfundamental right, such as a chapter 7 discharge, is implicated.  However, an analysis under that standard may be appropriate given the First Amendment challenge to religious exercise, plus the fundamental right of parents to direct how their children are raised.  Also, concurring and dissenting justices opined in *Smith* that a new form of constitutional scrutiny was not necessary, and the strict scrutiny standard applied to constitutional challenges involving fundamental rights remains appropriate.  Therefore, in an abundance of caution, this Court will analyze the section 707(b) constitutional challenge under both the hybrid-rights and the traditional strict scrutiny standards.

According to the *Smith* analysis, a statute must be neutral in its purpose, generally applicable, and free of "a system of individual exemptions" in order to escape heightened judicial scrutiny.  *Smith*, 494 U.S. at 884, 886 n. 3.  A law is neutral so long as its object is something other than the infringement or restriction of religious practices.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hileah*, 508 U.S. 520, 533, 113 S.Ct. 2217 (1993).  A law is not

---

[1]*See, e.g.*, Ming Hsu Chen, *Two Wrongs Make a Right: Hybrid Claims of Discrimination*, 79 N.Y.U. L. Rev. 685 (2004); Steven H. Aden, *When a "Rule" Doesn't Rule: The Failure of the Oregon Employment Division v. Smith "Hybrid Rights Exception*," 108 Penn St. L. Rev. 573 (2003); Timothy J. Santoli, *A Decade After Employment Division v. Smith: Examining How Courts Are Still Grappling with the Hybrid-Rights Exception to the Free Exercise Clause of the First Amendment*, 34 Suffolk L. Rev. 649 (2001).

generally applicable when it proscribes particular conduct only or primarily when religiously motivated. 16A Am. Jur. 2d *Constitutional Law* § 446.

The debtors argue that section 707(b)(2)(A)(ii)(IV) is not neutral because it specifically targets how much money an individual can spend on practicing their religion and it restricts it by arbitrarily placing a dollar amount on the annual amount that can be deducted on the means test. This Court rejects the debtors' analysis. First of all, the law does not target religion on its face. The challenged Code section provides that a "debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,775 per year per child, *to attend a private or public elementary or secondary school*." 11 U.S.C. § 707(b)(2)(A)(ii)(IV) (emphasis added). The Code provides neither a specific secular nor a specific religious exemption. Secondly, the law is not discriminatory in its object or purpose; the Bankruptcy Code's means test has a purely economic purpose and neither advances nor inhibits religion. And finally, the actual operation of the statute does not target the practices of a particular religion for discriminatory treatment. *See generally Lukumi*, 508 U.S. at 535-40, 557-58.

Simply because a law has an incidental effect on the debtors' religious practice, it is not unconstitutional. The same unpersuasive argument could be made by a debtor seeking additional expense allowances for food because their religious beliefs include dietary restrictions or frequent offerings to deities and hungry ghosts. Or because their religious beliefs require them to expend, say, $30,000 per year for a religious boarding school. While the debtors' remaining income after expenses may not be sufficient to enable them to pay for private schooling, it is their personal economic situation – not the Bankruptcy Code – that prevents them from simultaneously obtaining a costly parochial school education for their children and a chapter 7

8

discharge. This Court holds debtors have no federal constitutional right to a waiver of the standards set by section 707(b) – a neutral and valid law of general applicability – on the ground that the law is contrary to their religious beliefs.[2]

Additionally, under the lenient rational basis standard, this Court must consider whether or not the statute contains a system of individualized exemptions. *Smith*, 494 U.S. at 884. In *Smith*, the petitioners wanted an exemption from the general Oregon statute prohibiting peyote use as they intended it for use in religious ceremonies. Generally, such statutes contain a mechanism that is open to "unfettered discretionary interpretation."[3] Carol Kaplan, *The Devil Is In the Details: Neutral, Generally Applicable Laws and Exceptions from Smith*, 75 N.Y.U. L. Rev. 1045, 1081 (2000). A discretionary exemption from operation of a law might invite the singling out of religious practices without compelling justification. Like most of the new statutes under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, section 707(b)(2)(A)(ii)(IV) does not provide a debtor, trustee or court with any discretionary exceptions to its application. Since no such mechanism exists – let alone was enforced in a discriminatory

_____

[2]The US Trustee points out that the Catholic faith does not mandate parochial education for its practitioners and the debtors have only enrolled their children in the parochial school system since 2007. However, because the Free Exercise Clause mandates neutrality toward religion, this Court will not evaluate the reasons underlying the debtors' choice to educate their children in parochial schools. While the Free Exercise Clause does not protect personal preferences, *Frazee v. Illinois Dep't of Emp't Sec.*, 489 U.S. 829, 833, 109 S.Ct. 1514 (1989), for purposes of deciding this issue, the Court will presume that the debtors' religious beliefs regarding the education of their children are sincerely held.

[3]Laws, regulations, policies, and statutes that contain catch-all exceptions based on "good cause" standards, or that apply "except in exceptional circumstances," or prohibit conduct "other than in cases of hardship" would fall into this category. Each of these exceptions requires authorities to make discretionary decisions as to when an individual's unique circumstances meet the standard, based entirely upon their own assessment of the facts, without reference to any external, objective standard. Kaplan, 75 N.Y.U. L. Rev. at 1081 n.175. Section 707(b)(3) allows a court to evaluate the "totality of the circumstances" in determining abuse of the bankruptcy system when the formulaic presumption of abuse does not apply.

9

manner – this exception is not triggered.  Therefore, only if this constitutional challenge fits

within the exceptionally narrow hybrid exception established in *Smith*, will there be a need to

apply the compelling state interest test.  *See Smith*, 494 U.S. at 881-82 (reviewing hybrid

precedents that contained free exercise claims in combination with other fundamental rights of

freedom of press, freedom of speech, right of parents to direct education of their children,

compelled speech, and right to free association).

        Many of the hybrid-rights claims asserting a parent's right to direct the upbringing of

their children in combination with the right to free exercise of religion involve actions against

public schools.  *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526 (1972) (holding state

compulsory education statute unconstitutional to extent it compelled Amish parents to send

children to attend formal high school to the age of 16); *Brown v. Hot, Sexy and Safer

Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995) (alleging students' compelled attendance at sex

education program violated rights); *Jensen v. Reeves*, 45 F. Supp. 2d 1265 (D. Utah 1999)

(finding even if parents had stated cognizable hybrid-rights claim, school district had important

interest in disciplining pupils and interest justified school district's conduct in disciplining

student).  So, even acknowledging that the conjunction of the debtors' two rights may be

sufficient to raise a hybrid-rights claim, which this Court believes it does not, the debtors' claim

is not supportable in this instance.  While the debtors have the right to the free exercise of

religion and the right to direct the education and upbringing of their children, that right is not

independent of their personal economic limitations and choices.[4]  There is no duty of either the

_____

        [4]Most of the cases analyzing private parochial schools as an expenditure have not
considered the constitutionality of the statute; rather they have considered the totality of the
circumstances, including the reasonableness and necessity of the expenses, the reasons for
incurring the expense, the availability and quality of other educational school choices, and in
chapter 13 cases, the percentage of distribution to unsecured creditors.  *See, e.g., In re Watson*,

government or the debtors' creditors to fund their religious choices.

Congress has been cognizant of the intersection between bankruptcy and religious practices, and this has been reflected in recent legislation enhancing protections for debtors and religious and charitable organizations. The Religious Liberty and Charitable Donation Protection Act of 1998 (RLCDPA) was codified as amendments to several sections of the Bankruptcy Code, notably 11 U.S.C. §§ 548, 707, and 1325. It reflects congressional policy that religious and social values not be interpreted to the detriment of debtors who practice them, and it provides certain protections to donations by debtors to churches and charities. Deborah F. Buckman, *Validity, Construction, and Application of Religious Liberty and Charitable Donation Act of 1998*, 36 A.L.R. Fed. 2d 1 (2009). The act added subsection (b)(2) to 11 U.S.C. § 544, which excludes charitable contributions from the section 544 avoidance power, and also led to the amendment of section 548(a)(2). Under that amendment, charitable or religious contributions are not considered fraudulent transfers if the transfers do not exceed 15% of the debtor's gross annual income, or, if they do, if the transfers are consistent with the practices of the debtor in making charitable contributions. *See In re Lewis*, 401 B.R. 431 (Bankr. C.D. Cal. 2009) (calculating the 15% income limitation). It also reflects a congressional trend toward objective standards rather than discretionary judicial interpretations.

The RLCDPA also amended section 707(b) to remove certain charitable contributions from consideration in motions to dismiss for abuse under that section. *Cf. In re Norris*, 225 B.R. 329 (Bankr. E.D. Va. 1998). Similarly, section 1325, which sets forth the standards for chapter 13 plan confirmation, includes the "disposable income" test, requiring debtors to dedicate all of

---

403 F.3d 1 (1st Cir. 2005); *In re Lynch*, 299 B.R. 776 (W.D.N.C. 2003); *In re Webb*, 262 B.R. 685 (Bankr. E.D. Tex. 2001); *In re Nicola*, 244 B.R. 795 (Bankr. N.D. Ill. 2000).

11

their disposable income to a plan for a minimum of 36 months. Prior to the RLCDPA, section 1325(b) defined "disposable income" solely to mean the excess of monthly income over those expenses "reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." The RLCDPA amended section 1325(b)(2) to permit exclusion of charitable donations up to 15% from the calculation of "disposable income."[5] The debtors in this case agree that parochial school tuition does not qualify as a charitable deduction. *See In re Watson*, 309 B.R. 652 (B.A.P. 1st Cir. 2004), *aff'd*, 403 F.3d 1 (1st Cir. 2005) (right of debtors to practice their religion was not substantially impaired by the rejection of chapter 13 plan which included $750 per month in parochial school tuition).[6]

The exercise of religion is not the only constitutionally fundamental right impacted by the bankruptcy code. Creditors, as well as debtors, have challenged the constitutionality of certain provisions of the Bankruptcy Code, such as whether the automatic stay infringes on their freedom of speech, another fundamental right guaranteed under the First Amendment. *Compare Matter*

---

[5]Due to Congress' enactment in 2005 of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), the RLCDPA's amendments regarding charitable contributions do *not* extend to chapter 13 debtors, such as the Meyers, whose income is considered over-median. *See, e.g., In re Meyer*, 355 B.R. 837 (Bankr. D. N.M. 2006); *In re Diagostino*, 347 B.R. 116 (Bankr. N.D.N.Y. 2006).

[6]The *Watson* case involved the payment of $735 per month in tuition for the debtors' children to attend the private school run by their church. 309 B.R. at 657. The appellate panel found that tuition payments did not equate to tithes to the church permitted by the Religious Liberties Act. Further, denying the debtors' request to use funds in the chapter 13 to pay tuition did not unconstitutionally infringe upon the debtors' religious practices because sending children to a church school did not constitute a fundamental tenet of their religious beliefs. *Id*. at 661. The *Watson* panel recognized that chapter 13 plans do sometimes allow debtors to send children to private schools – primarily based on the debtors' good faith attempts to repay the maximum possible to creditors. In most of the cases so allowing, the debtors took money used to send children to private school from their own personal budgets or extended the term of a 36-month plan to 60 months, rather than taking from the funds that could repay creditors. *Id*. at 661-62.

12

*of National Serv. Corp.*, 742 F.2d 859 (5th Cir. 1984) (creditor, a lessor of billboards, superimposed over the debtor's billboards in large black letters: "Beware, This Company Does Not Pay Its Bills," and "Beware This Company Is In Bankruptcy;" held to be constitutionally protected free speech and not in violation of automatic stay); *with In re Andrus*, 189 B.R. 413 (N.D. Ill. 1995) (contempt order against creditor for posting signs declaring debtor "a deadbeat" violated discharge injunction; injunction did not unnecessarily impinge on creditor's free speech rights). Recently, the Supreme Court determined that the client advice restrictions and disclosure requirements imposed by the 11 U.S.C. § 526(a)(4) do not violate the First Amendment Free Speech clause, as applied to attorneys. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S.Ct. 1324 (2010).

In a scenario this district is all too familiar with, the US Trustee sought injunctive and other relief against a bankruptcy petition preparation service that allegedly had violated the Bankruptcy Code. *In re Barcelo*, 313 B.R. 135 (Bankr. E.D.N.Y. 2004). The defendant moved to dismiss, claiming the regulatory strictures of 11 U.S.C. § 110 violated the First Amendment. The bankruptcy court found that the government had a substantial interest in regulating bankruptcy petition preparers, "who are not trained in bankruptcy law and who may misguide unsuspecting debtors." *Id.* at 147. The court also found that the advertising restriction directly advanced the asserted interest by regulating deceptive advertising and otherwise assuring accuracy in the preparation of bankruptcy petitions, and was appropriately tailored to serve the governmental interest. *Id.* at 148. The Ninth Circuit upheld section 110 against a First Amendment challenge on similar grounds in *In re Doser*, 412 F.3d 1056, 1064 (9th Cir. 2005), finding the statute justified in light of the "substantial interest in protecting pro se debtors from fraudulent and deceptive practices of non-attorneys who prepare bankruptcy petitions."

13

Under the specific facts of this case, the Code is not preventing the debtors from enrolling their children in a parochial school. Their personal economic situation is. *Cf. Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 103 S. Ct. 1997 (1983) (discrimination is not shown merely because a state legislature has chosen not to subsidize the exercise of a fundamental right, and the strict scrutiny test does not apply in such situations). In essence, the debtors are asking that their creditors, not the state, subsidize the cost of their choice to incur the cost of private education, thus allowing them to spend their limited income on tuition rather than legitimate debts.

Even if the court were to find that the debtors' right to so educate their children is infringed by the applicable law, the Code still withstands strict scrutiny, the highest test for constitutionality. To withstand strict scrutiny, the policy of the challenged statute must be necessary to achieve a compelling state interest. If this is shown, the statute must, in turn, be narrowly tailored to achieve the intended result. 16B Am. Jur. 2d *Constitutional Law* § 862. Congress has chosen to protect the interests of creditors by limiting access to a chapter 7 discharge in cases where debtors have the means to pay at least some of their debts, and it has chosen an objective means to do so. This is a compelling rationale. The challenged means test provision in section 707(b) of the Bankruptcy Code passes all tests for congressional compliance with constitutional authority.

CONCLUSION

In enacting section 707(b) in general and section 707(b)(2)(A)(ii)(IV) in particular, Congress demonstrated a compelling interest in maintaining an equitable system for the protection of creditors and for permitting debtors to obtain a fresh start from overwhelming debt. *In re Ross-Tousey*, 549 F.3d 1148, 1151 (7th Cir. 2008) ("The purpose of the means test is to

distinguish between debtors who can repay a portion of their debts and debtors who cannot."); *In re Armstrong*, 370 B.R. 323, 329 (Bankr. E.D. Wash. 2007) (purpose of section 707(b) is to provide a mechanism to identify debtors who can afford to repay creditors). Congress thus structured a mathematical formula – the "means test" – as a standard for dismissing chapter 7 cases as abusive. *See* H.R. Rep. No. 109–31(I), at 1, reprinted in 2005 U.S.C.C.A.N. at 89 (describing the "income/expense screening mechanism" as "[t]he heart of the bill's consumer bankruptcy reforms"). This mathematical formula is then enforced without regard to the debtors' personal circumstances, aside from those described in section 707(b)(2)(B)(i) (debtor is given the opportunity to rebut the presumption of abuse by showing that "special circumstances," such as a serious medical condition or active duty military service, justify an income adjustment or additional expenses).

The goal of balancing the rights of creditors with the fresh start of debtors imposes neither a diffuse burden on debtors in general nor an intrusive burden upon these debtors in particular. The difficulty, if any, that section 707(b)(2)(A)(ii)(IV) imposes on debtors by limiting their expenses for private tuition is not too great to be constitutionally unacceptable. Denial of a chapter 7 discharge under these circumstances does not infringe upon the ability of the debtors to practice their religion; especially when chapter 13 is an option.[7] The means by which Congress regulates those competing rights of debtors and creditors in section 707(b)(2)(A)(ii)(IV) are not unnecessarily broad and are no more restrictive than necessary to achieve the compelling state

---

[7]The debtors argue section 707(b)(2)(A)(ii)(IV) interferes with their choice to practice their religion "because they are faced with either converting to a chapter 13 that they clearly cannot fund or get the case dismissed and continue raising their children religiously." (Debtors' Reply Brief, p. 5). The debtors' ability to fund a chapter 13 plan has not been determined. Regardless, inability to fund a chapter 13 plan is irrelevant to a determination of dismissal under section 707(b). *See In re Richie*, 353 B.R. 569 (Bankr. E.D. Wis. 2006).

15

interest of the means test. Therefore, the debtors' arguments regarding the unconstitutionality of 707(b)(2)(A)(ii)(IV) are rejected under a strict scrutiny analysis, as well.

Because section 707(b)(2)(A)(ii)(IV) is not unconstitutional and the debtors have failed to rebut section 707(b)(2)(A)(i)'s presumption of abuse, the United States Trustee's motion to dismiss is granted. A separate order will be entered and stayed for 30 days to provide the debtors with an opportunity to voluntarily convert the case to chapter 13.

March 22, 2012

Margaret Dee McGarity
United States Bankruptcy Judge